Irwin, Keelan & Sterck, Inc., *v.* Tracy, Appellant.

Argued October 4, 1928. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*A. L. Petty,* for appellant.—The pleadings themselves preclude the recovery of the claim for which verdict was rendered in favor of another: Cullen v. Stough, 258 Pa. 196; Long v. Coal & Navigation Co., 292 Pa. 164.

In such case, the Act of April 26, 1855, P. L. 308, applies, and the defendant is not liable upon a promise to answer for the debt or default of another, unless the agreement so to do, or some memorandum, is in writing, signed by him or by some other person authorized by him: Rapp v. Snyder, 292 Pa. 400; Nugent v. Wolfe, 111 Pa. 471; Putnam Machine Co. v. Cann, 173 Pa. 392.

The only basis of recovery entertained by the learned trial judge was the promise alleged to have been made in July 1926: Hess's Est., 150 Pa. 346; Nugent v. Wolfe, 111 Pa. 471; Maule v. Bucknell, 50 Pa. 39; Bayard v. Knitting Mills, 290 Pa. 79.

*J. A. Langfitt,* with him *J. A. Langfitt, Jr.,* for appellee.

OPINION BY MR. JUSTICE FRAZER, November 26, 1928:

Plaintiff corporation contracted in writing with defendant, Tracy, to furnish him with commercial advertising material and services during a period of one year, beginning July 14, 1925. At that date defendant was engaged in promoting the formation of a corporation for the manufacture and sale of refrigerating apparatus, but no company was organized for that purpose until the following October 14th. By the terms of the contract plaintiff company was to act as Tracy's advertising agency and as such prepare catalogues, folders and other like material, attend to the necessary engraving

and printing, make contracts for advertising space in newspapers and other publications and furnish the required written matter. Plaintiff was to realize its profit from the fifteen per cent commission allowed it by newspaper publishers, and, where no such commission was thus allowed, defendant agreed to pay in such cases, and also reimburse plaintiff for moneys expended for such advertising. In addition, plaintiff was to receive from defendant a service fee of $200 per month for writing and furnishing designs for folders and kindred productions. The contract contained these two clauses: "We will execute no work for you involving the expenditure of money by you without your written authority for such expenditure," and "This letter is a contract binding on both parties and noncancellable for one year from date."

The circumstances, as revealed by the evidence, out of which the contract arose, were these: Defendant having gone to plaintiff's place of business to order a trademark design for his proposed corporation, discussed with its officers the question of engaging its services as his advertising agent. Following later conferences between the parties, the terms of a contract were agreed upon which was prepared by plaintiff. As at that date Tracy had no corporate existence, and as plaintiff was negotiating with him as the sole financially responsible party, the agreement was put in the form of a letter to him, and delivered by mail for his approval. He promptly returned it with his approval, signed in the following manner: "Approved, B. P. Tracy Co., B. P. Tracy, Refrigidor Inc., By C. D. Ryder, G. M."

Immediately upon execution of the contract plaintiff company proceeded with the services contracted for. It prepared booklets and other material, advertised in newspapers and made designs to be engraved and printed as advertising for appellant. Four months after the agreement was signed, Tracy formed a corporation known as "Refrigidor, Inc.," with C. D. Ryder as presi-

dent and Tracy as treasurer, and subsequently a small amount of stock was sold. Later the name of the concern was twice changed; the parties, however remained the same, and after nine months of existence it failed financially.

The claim sued for comprises unpaid bills delivered by plaintiff to defendant for April, May and June, 1926, an indebtedness incurred within the life of the contract. The claim, as set forth in plaintiff's statement, amounts to $8,362.50, the original debt being $9,362.50, against which was credited a payment by Tracy of $1,000. The total claim was made up by a charge for the monthly service fee, as stipulated in the agreement, of $200 per month, amounting to $2,400 and from sums paid by plaintiff for advertising in various mediums for the benefit of defendant. The jury found in favor of plaintiff in the sum of $6,499.13, disallowing the claim for $2,400, on evidence that stock of the corporation formed after the contract was made, had been issued to that amount by defendant to plaintiff. Motions for new trial and judgment n. o. v. were refused by the court below and defendant has appealed.

We shall not take up in their order the eight assignments of error presented by appellant, but shall consider the essential ones in our review of the evidence in general. There is no dispute as to the amount of the claim as found by the jury, but appellant contends that it was not the debt of Tracy, but primarily the debt of the corporation, first known as Refrigidor, Inc. Before giving attention to that contention, we shall consider appellant's second, seventh and eighth assignments, which refer to the charge of the court in relation to the provision in the contract that plaintiff was not to execute any work for defendant involving the expenditure of money without written authorization from appellant for such expenditure. Admittedly there was a departure in this respect, at the very beginning of plaintiff's services, from that stipulation, and the change thus be-

gun was without variation followed to the end of the business relations between the parties. It came about, as the record shows, in this manner: As a commercial advertising agency, plaintiff company, in the process of its work for appellant, arranged on paper forms of advertisements, matter for newspapers, folders and other like material, as needed, and also sketches of designs, made by its artists, for use in connection with the advertising campaign. Sheets of paper so arranged are, as was testified, known in the commercial printing trade as "layouts." This was the regular method pursued by plaintiff throughout its dealings with appellant. A layout thus prepared would be sent to Tracy, or to one delegated by him to act for him, for acceptance or rejection. If approved and accepted, it was at once marked by Tracy or his representative with the letters "O K," with the name of the writer of the two letters following. The layout so marked and returned to the advertising agency constituted, as plaintiff claims and as the record in the case unquestionably proves, an order from defendant to plaintiff to proceed and have the layout reproduced in the folder or advertisement, as the case might be. It is true, apparently none of these layouts were thus signed by defendant himself, being always signed "O K, C. D. Ryder." But as testimony, which we consider reliable, proves, Ryder was at the start of plaintiff's services especially delegated by Tracy, in the presence of two of plaintiff's witnesses, to pass upon layouts submitted and, if satisfactory, acknowledge their acceptance and give the order for final production as advertisements, and invariably the order was denoted as stated above. Keelan, a member of plaintiff's advertising agency, testified: "An O K constitutes an order in this line of business. In other words, if I submit a piece of typewritten copy and layout, and that is O K'ed, that O K on the copy and layout constitutes an order." Keelan testified further on: "Mr. Tracy never O K'ed these things; he said: 'I don't want anything to

do with that,' when he first went into it. The reason why we don't have Mr. Tracy's O K was on Mr. Tracy's request." He was asked: "Was each and every item claimed by you under April, May and June so O K'ed? A. Yes, sir." Further on, under objection, he said: "Well, when we first got together, Mr. Tracy introduced me to Mr. Ryder and his partner, both engineers, and told me he had all the confidence in the world in these two men, and that Mr. Ryder was in charge of the sales, and our advertising should therefore be O K'ed by him. I know of several cases I did take up the matter of O K'-ing of the expenditures with Mr. Tracy, but I had no dealings with Mr. Tracy on that score." He further testified that Tracy made the arrangement with respect to Ryder's attention to the layouts about a week after the signing of the contract. Sterck, president of plaintiff company, testified: "Every piece of work was O K'ed." On the other hand, appellant testified that he never delegated Ryder to place the O K, or in any other way approve the work submitted by appellee. We have no evidence from Ryder himself on that aspect of the case, because he was not put on the stand during the trial. It appears clear from the testimony that Tracy himself never so marked any of the layouts presented by plaintiff. But it would be an absurdity to believe that the plaintiff company, doing business with Tracy under contract, would deliberately incur heavy financial obligations by getting out work that was not approved and not ordered. There must have been somebody connected with Tracy's business delegated to approve layouts submitted and give the order for their final production; and since all orders were thus signed by Ryder he must have been the person so delegated. In fact Tracy in his testimony does not repudiate these orders, he denies he agreed to pay them or that he authorized them. This phase of the case was, at the request of defendant's counsel, stated to the jury in a fair and proper manner by the learned trial judge, who said in his charge: "The

claim of plaintiff is that, within a few days, within the time the contract was signed, the defendant, in the presence I think of two representatives of the plaintiff, had delegated Mr. Ryder as the party who should approve these orders which were submitted......But the testimony on behalf of the defendant is to the contrary. He said he never delegated Mr. Ryder to O K, approve or otherwise give his consent to the granting of those orders from the plaintiff's customer. Of course, if there is testimony to the contrary, that would be binding upon the plaintiff." There certainly was reliable evidence to the contrary, and to oppose it there was neither testimony by Ryder himself, nor any minutes of the corporation or other evidence to show that anyone other than Tracy had delegated Ryder to approve the samples of work and give the order for its production in the shape of public advertising. The method thus adopted and followed by defendant was in fact initiated by him. It was a detail of the business he did not desire to be bothered with; it was accepted as a custom of the trade by plaintiff and there was never any dissatisfaction expressed on either side with the custom thus put into practice. If it constituted a modification of the contract, it was a modification mutually adopted and followed by the parties to the agreement.

The jury found the debt to be that of defendant. An attentive review of the record convinces us they could not in justice have found otherwise. The contract by its terms proves it to be an agreement made directly between plaintiff and defendant. The signature, "By C. D. Ryder, G. M.," can have no significance. At the date of the contract and during four months afterward there was no corporation in existence to manufacture and sell refrigerators and consequently no general manager or other official to represent a corporate entity as a party to the agreement. Plaintiff recognized and accepted Tracy as the sole promoter and financial backer of his proposition. As he was the one from whom the payment

for their services was to come, they looked up his financial rating and found it satisfactory. His signature to the contract was the only legal one, and plaintiff, as they testified, dealt with him as an individual. He held himself out to them and to the public as sole promoter in a prospectus he sent out, in which he made these assertions: "I am promoting a company to engage in the manufacture and sale of a unit which I believe (and my engineers know) is far superior to any other on the market today......In inviting my personal friends and acquaintances to subscribe......I have taken every precaution to safeguard their investment......If you should desire further information I shall be pleased to see you either at this office or in the evening at my home."

Plaintiff performed its work under the contract in a proper and business-like way, and the orders for work it received were unquestionably orders of Tracy, transmitted to plaintiff by the person delegated to do so. Keelan, a member of plaintiff firm, testified: "As far as we were concerned, Tracy was the company." It seems there was a tentative promise by plaintiff to look to the corporation for its pay, if it found it to be financially responsible. It was never found to be responsible, there is no evidence to show that it at any time became so, and plaintiff never released defendant from his personal liability. In May, 1926, plaintiff asked Tracy to make a payment on the overdue bills. He gave them a check for $1,000 signed "Refrigidor, Inc., B. P. Tracy," yet five months before the date of the check the title "Refrigidor, Inc.," had been dropped and the concern was operating under a new name. The inference is inevitable that the corporation, under the new name, could not meet the check, and Tracy simply paid the $1,000 with an old Refrigidor, Inc., check, which he personally signed. Shortly afterwards, plaintiff went to him for more money due and was informed by Tracy that he was financially embarrassed and had no money. He how-

ever, agreed to pay $1,500 in cash and the balance in a series of notes for 30, 60, 90 and 120 days. The next day he wrote plaintiff denying all liability for the debt, claiming the corporation, which had already collapsed financially and gone out of business, was responsible. Defendant's fifth assignment of error is directed against the part of the charge of the trial judge referring to this phase of the case. The court said: "Now if you find from the evidence that the plaintiff and the defendant, Mr. Tracy himself, made that agreement [to pay $1,500 cash and the remainder in notes], as claimed by the plaintiff, then the jury would be justified in finding a verdict in favor of the plaintiff. But, on the other hand, if you believe that the defendant did not make that agreement as claimed by the plaintiff, then the jury would be justified in finding a verdict in favor of defendant, because if that agreement was made, then the defendant would be responsible for his conduct." The jury found that defendant did make such agreement.

But counsel for defendant contends this agreement by Tracy to pay plaintiff was in fact a promise to pay the debt of another and is within the statute of frauds; but, being an oral and not a written agreement, defendant is not liable. There is no foundation for this claim. The contract was to continue one year, all debts sued for were contracted by defendant within the life of the agreement; plainly, plaintiff always dealt with Tracy as an individual, as the sole party responsible for payment of its services to him. The liability of defendant began with the execution of the contract, and at no time by word or act on the part of plaintiff was the obligation to pay shifted from the shoulders of Tracy to another person or corporation. When he paid the $1,000 he made no claim that the existing debt was the debt of the corporation, and his subsequent agreement to pay the balance in cash and notes was simply his own particular mode of paying a just claim against him. All that he thus guaranteed was in fact his own debt. The contract

and his subsequent dealings with plaintiff in the matter of work and services by it were his original undertakings; the consequent indebtedness was primarily his own, and he cannot now find a release from it under the statute of frauds. The statue contemplates the mere promise of one man to be responsible for another, and cannot be interposed as a cover and shield against the actual obligations of the defendant himself: Malone v. Keener, 44 Pa. 107, 109.

The third assignment of error refers to the refusal of the court below of defendant's point to the effect that the services of plaintiff could not be charged to defendant unless he expressly agreed to be responsible for the debts of the corporation. The evidence, as we have found in our review of the record, proves that the debts were the personal obligations of Tracy, and the jury so found.

Judgment affirmed.